# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CRISTI CAMPBELL,
ADMINISTRATRIX OF THE
ESTATE OF BRYANA BAKER,

      Plaintiff,

                                    Case No. 1:20-cv-678

    v.                             JUDGE DOUGLAS R. COLE

APRIL RIAHI, et al.,

      Defendants.

## OPINION AND ORDER

Tragedy struck at Butler County Jail on September 25, 2018. Bryana Baker, an inmate there, hanged herself while locked alone in a cell. She'd recently come off suicide watch and, like nearly all of the inmates at the facility, had not been cleared for single celling. But she and her cellmate fought. Fearing for their safety, a jail guard put them in separate cells for a few minutes while seeking help. That's when Baker died by suicide. It was a horrifying chain of events for all involved. Cristi Campbell, Baker's mother and the administratrix of her estate, claims the tragedy was preventable. She has sued:

- April Riahi, the jail guard,

- Richard Jones, Sheriff of Butler County,

- the Butler County Board of Commissioners,

- and Butler County itself.

Defendants have now moved for summary judgment. (Doc. 35). Based on its review of the record, the Court concludes that, while Baker suffered a senseless death,

Campbell cannot show her jailers bear responsibility for it. So the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 35) and **DISMISSES** her Complaint (Doc. 1) **WITH PREJUDICE**. In addition, the Court **DENIES AS MOOT** Campbell's Motion to Strike (Doc. 49).[1]

## BACKGROUND

As is often the case with people who die by suicide, Baker led an unreasonably hard life. She had a drug addiction problem that ceaselessly hounded her. (Doc. 23–2, #814–19; Doc. 46-1, #2792–93). Over time, she drifted from addiction to other criminal behavior, either resulting from or supporting that addiction. (Doc. 23–2, #814–19). On September 19, 2018, she once again found herself in jail. (Doc. 46-1, #2790). This time it was for failing to appear for an arraignment in an assault case. (*Id.* at #2790–91). Perhaps unsurprisingly given her addiction issues, she was also charged with drug possession on the day she was booked. (*Id.* at #2791).

She was originally detained at the Butler County Jail's Main facility. (*Id.* at #2790). But on the evening of her arrest, she was transferred to the "Court Street" location. (*Id.* at #2791). That didn't last long. While there, she began experiencing withdrawal symptoms and became disruptive. (*Id.*). So the next morning, jail personnel transferred her back to the Main Jail. (*Id.*). During transport to the Main

---

[1] Based on the Court's review of Defendants' opening brief in support of the Motion for Summary Judgment and Campbell's opposition, the merits appeared to favor Defendants. So the Court largely avoided relying on their reply, which is the brief that Campbell moves to strike. When the Court did rely on the reply, it also considered Campbell's proposed sur-reply (which she tendered as an alternative to her request to strike). But note that the Court does not suggest anything about the merits of Campbell's Motion to Strike. It simply did not affect the outcome. Thus, the issue is moot.

Jail, Baker briefly escaped into the Court Street parking lot. (McIlvaine Dep., Doc. 22, #630). Upon recapture, a forensic report was prepared that noted her escape attempt and revealed she was going through withdrawal from methadone, heroin, and alcohol. (Doc. 23–2, #782).

When Baker arrived back at the "Main Jail" facility, Becky Brown, a licensed social worker, completed a forensic intake examination. (Doc. 46-1, #2792). Brown concluded that Baker was going through withdrawal but that she was not suicidal. (*Id.* at #2792–93). Nonetheless, corrections officers decided to place her on "suicide watch" because of the erratic behavior she had displayed in attempting escape. (Doc. 23–2, #782).

While on suicide watch, Baker was housed in a glass cell in the intake area, and officers checked on her every ten minutes. (Doc. 24-2, #1100–04; Brown Dep., Doc. 27, #1710). Brown reassessed Baker the next day, September 21, and concluded that she continued to experience withdrawal and was a "medium" suicide risk. (Doc. 26-2, #1610). Brown also concluded that she should remain on watch. (*Id.*). The next day, Baker's condition and her conduct worsened, ultimately resulting in officers placing her in a restraint chair for two hours. (Doc. 22, #629–30). Brown again examined her and concluded she should remain on suicide watch, with another assessment in 24 hours. (Doc. 26-2, #1608–09). Another social worker, Michelle Reimer, reached the same conclusion the following day. (*Id.* at #1607–08).

Things changed, though, on September 24. Lead Social Worker Christina Dingledine arrived to find the withdrawal symptoms were abating. (*Id.* at #1606).

Baker reported that she was feeling "better overall" and that she had identified coping skills for her anxiety. (*Id.*). Based on Dingledine's evaluation of Baker, Dingledine determined that Baker was a low risk of suicide and released her from suicide watch. (*Id.*). That said, Dingledine noted that Baker was not cleared for a single cell, due to residual concerns about suicide or self-harm. (*Id.*). That did not make Baker unique. The general rule at Butler County Jail is that inmates are not cleared for single-cell placement. (Adams 1/28/22 Dep., Doc. 24, #1062). And any time an officer is going to place an inmate in a single-cell placement, the officer must first obtain express approval from Forensics. (*Id.* at #973). That is because it is generally understood that single-cell placements may give rise to opportunities for self-harm. (Baughman Dep., Doc. 21, #343–44; Dingledine Dep., Doc. 26, #1570–71).

Once she was removed from the suicide watch cell, Baker was placed in isolation housing (the step before general population) in a cell with Rosanna Herbert. (Doc. 21, #363, 367). Herbert was the only other female inmate in isolation housing, and thus was the only potential cellmate for Baker so long as she remained in isolation. (Opp'n, Doc. 46, #2748).

On the next morning, September 25, Riahi was working. Baker went to court in the morning. Upon her return, Herbert went to court. (*Id.* at #2749; Doc. 21, #385). That left Baker alone in her cell with the door open. During the afternoon, Riahi conducted observation rounds and established a playful, joking rapport with Baker.[2]

---

[2] Campbell denies these details as "an[] after-the-fact attempt … to characterize Riahi's interactions with [Baker] as polite or friendly." (Doc.46-1, #2814–16). But Campbell fails to identify "specific facts" that refute Riahi's account of what transpired during her afternoon

(Doc. 21, #379–80). Things took a turn when Herbert arrived back from court. Baker buzzed Riahi on the intercom and claimed that Herbert was assaulting her. (*Id.* at #414–15). When Riahi investigated, both women were yelling at each other and calling the other crazy.

After consulting her supervisor, Riahi moved Herbert to a single cell next door but kept both doors open. (*Id.* at #422; Doc. 23-2, #783). The fighting continued. Herbert apparently returned to her former cell and assaulted Baker and then fled to her new cell. (Doc. 21, #422–23, 425). Riahi again called her supervisor, while Baker allegedly assaulted other inmates and then went over to Herbert's new cell to return the favor. (*Id.* at #423–24, 429). They continued to brawl, so Riahi temporarily shut the cell doors after separating them "to stop the threat." (*Id.* at #429–30). Meanwhile, she continued to speak to her supervisor to find an appropriate resolution. (*Id.* at #428–30, 441). Within ten to fifteen minutes after Riahi closed the doors,[3] Baker hanged herself. (Doc. 21, #441–42; Doc. 23-2, #762, 784).

---

rounds to check in on Baker. *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009). Campbell's citation to another inmate's description of insults Riahi allegedly used against Baker earlier that day, (Doc. 46, #2749), even if presented at trial in an admissible form—an issue the Court does not address—fails to create a triable issue of fact. It deals with an orthogonal issue: whether Riahi insulted Baker speaks to Riahi's personal opinion of her— not to what their interactions later in the day entailed. Thus, Campbell does not create more than a "metaphysical doubt" as to what occurred during Riahi's interactions with Baker on the afternoon of September 25. *Matsushita*, 475 U.S. at 586.

[3] While the parties dispute the exact time frame, (Doc. 46-1 ¶ 162, #2824–25), Plaintiff admits that Riahi closed the doors "at approximately 5:00 p.m.," (*Id.* ¶ 156, at #2823), and that a call was placed to the prison investigator "at approximately 5:10 p.m." to notify him of the hanging and to order him to begin an investigation, (*Id.* ¶ 188, at #2828). And Plaintiff fails to identify evidence that contradicts the notation in the prison's investigative report that Riahi was notified of Baker's death at "5:13 p.m." (Doc. 23-2, #784). These undisputed facts demonstrate that Baker had been alone in her cell for approximately ten to fifteen minutes before hanging herself.

Baker's mother sued all the Defendants under § 1983 and Riahi and the Sheriff alone under state law. Her federal claims consist of deliberate indifference claims against Riahi and the Sheriff, and *Monell* claims against Butler County and its Board of Commissioners. Meanwhile, her state-law claims against Riahi and the Sheriff sound in wrongful death and negligence. Now, Defendants move for summary judgment, while Campbell moves to strike their reply to her response in opposition. The motions are ripe for review.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must establish that there are no genuine disputes of material fact, which may be accomplished by showing that the non-moving party lacks evidence to support an essential element of her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).

But as the Sixth Circuit has explained, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (cleaned up) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)).

In sum, the non-moving party, at this stage, must present some "sufficient disagreement" that would warrant submission to a jury. *See Moore v. Phillip Morris*

*Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## LAW AND ANALYSIS

Campbell brings claims under federal and state law. Her federal claims arise from 42 U.S.C. § 1983, which "creates a cause of action against any person who, under color of state law, deprives 'any citizen of the United States ... of any rights, privileges, or immunities secured by the Constitution and laws.'" *Harris v. Olszewski*, 442 F.3d 456, 460 (6th Cir. 2006) (quoting § 1983). Here, the Court considers several alleged violations of the Fourteenth Amendment by Baker's jailers, which can be broken into two categories: deliberate indifference claims against Riahi and the Sheriff, and *Monell* claims against Butler County and its Board of Commissioners. Meanwhile, she also asserts state-law wrongful death and negligence claims, which she brings solely against Riahi and the Sheriff. All fail.

### A.     Deliberate Indifference Claims.

"Pretrial detainees have a right to adequate medical care under the Fourteenth Amendment. An officer violates that right if that officer shows deliberate indifference to a pretrial detainee's serious medical needs." *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) (cleaned up) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Greene v. Crawford Cnty.*, 22 F.4th 593, 605 (6th Cir. 2022)).

But there's a bit of a problem in analyzing such claims. Since *Brawner v. Scott Cnty.*, 14 F.4th 585 (6th Cir. 2021), changed the traditional test for deliberate indifference claims, district courts have faced conflicting guidance from the Sixth Circuit about the appropriate analytical framework. Sometimes, the Sixth Circuit says liaiblity arises only when a prison official actually "knew that [the] failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *See Trozzi v. Lake Cnty.*, 29 F.4th 745, 757–58 (6th Cir. 2022). Other times, the court says "should [have] known" is enough. *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 317 (6th Cir. 2023) (rejecting *Trozzi* as irreconcilable with *Brawner*, and finding that *Brawner* controls under prior panel rule). Absent clarification,[4] the safest course is perhaps to analyze such claims under both standards, with fingers crossed that they agree. Thankfully, here, they do. Even under *Helphenstine*'s more plaintiff-friendly standard, Campbell's claims fail. So the Court will explain its decision using that standard.

Under *Helphenstine*'s reading of *Brawner*, the Court must evaluate a claim of deliberate indifference by asking whether the detainee

1. had a sufficiently serious medical need and
2. each defendant acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.

---

[4] Recently, the Sixth Circuit decided not to accept the issue for en banc review. *Helphenstine v. Lewis Cnty.*, 65 F.4th 794 (6th Cir. 2023).

*Helphenstine*, 60 F.4th at 317 (6th Cir. 2023) (cleaned up) (quoting *Brawner*, 14 F.4th at 596). The first is often called the objective component, while the second is called the subjective component. Campbell cannot show either component.

**1. Objective Component.**

It might seem straightforward that if a woman kills herself, she had some sort of "serious medical need." But this first element, which *Brawner* and its progeny did not alter,[5] is a bit more nuanced than that. A "medical need [is] sufficiently serious" if the plaintiff can show that "the conditions of incarceration imposed a '*substantial risk of serious harm.*'"[6] *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020) (emphasis added) (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005)). Of course, suicide constitutes "serious harm." So "[a] detainee's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994). But merely showing Baker at one point *had* suicidal tendencies does not

---

[5] "*Brawner* left the 'objectively serious medical need' prong untouched." *Hyman*, 27 F.4th at 1237.

[6] The Sixth Circuit has also stated that a "sufficiently serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020) (cleaned up) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)). But this is not to suggest that all medical conditions requiring treatment are sufficiently serious. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897–98 (6th Cir. 2004). "[M]inor maladies or non-obvious complaints of serious need for medical care" cannot support a deliberate indifference claim unless the plaintiff "place[s] verifying medical evidence in the record to establish the detrimental effect" of a failure to provide medical care. *Id.* The key inquiry underlying this analysis is whether the medical condition from which a detainee suffers creates a substantial risk that serious injury might manifest and thereby creates a constitutional obligation to address that risk "to avoid 'the unnecessary and wanton infliction of pain.'" *Id.* at 896 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

equate to establishing that Baker had serious medical needs constitutionally requiring Defendants' attention at the time of the events at issue. Rather, Campbell must show facts from which a jury could conclude that at the relevant time, Baker had "psychological needs [that] manifest[ed] themselves in suicidal tendencies." *Davis v. Fentress Cnty.*, 6 F. App'x 243, 249 (6th Cir. 2001). And not just any level of suicidal tendencies will do. Rather, Campbell must present facts "demonstrat[ing] a *strong likelihood* that [s]he w[ould] commit suicide."[7] *Bradley v. City of Ferndale*, 148 F. App'x 499, 506 (6th Cir. 2005) (emphasis added). Campbell cannot do so.

True, following her earlier escape attempt, non-expert jail staff—not the jail's expert forensics staff—placed Baker on suicide watch. (Doc. 22, #577–78; Doc. 23-2, #782). And while on watch she experienced withdrawal, which made her do unusual things like jump off half walls. (Doc. 27, #1717). That led the jail forensic team to conclude that she should remain on that suicide watch over each of the next few days. (*Id.* at #1716–18). But four days after first being placed on suicide watch, the forensic team leader (Dingledine) again re-evaluated her. (Doc. 26-2, #1606–07). And Dingledine concluded that Baker no longer exhibited suicidal tendencies. (*Id.* at

---

[7] Note that suicidal ideation is unique among medical conditions because it depends on an intervening cause to manifest—the volitional act of the prisoner to engage in self-harm. Unlike other symptomology, such as vomiting, bleeding, or the like, which are all involuntary physiological reactions, the harm arising from suicidal ideation depends on the actor's own conduct. But that does not mean that the prisoner's conduct relieves others of potential liability—suicidal ideation still reflects the prisoner's mental condition and is indicative of a deeper psychological condition that may be serious or obvious enough to require medical care. *Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir. 1992) (In the context of a detainee's suicide, the objective component asks "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs."). For this reason, prison officials are still obliged to manage any suicide risk that gives rise to a substantial risk that self-harm will manifest absent proper medical care.

#1606). In fact, Dingledine declined to diagnose her with *any* psychological condition. (*See id.* at #1607 (She left the "diagnosis" box empty.)). It's unsurprising why. Baker denied "any current suicidal ideation," "for clear reasons" in Dingledine's estimation. (*Id.* at #1606). Baker reported that "she is no longer withdrawing" and that "she feels more clear and feels better overall." (*Id.*). Based on all of this, Dingledine rated her risk of suicide "[l]ow" and said she had "no intent or plan" to kill herself. (*Id.*).

Moreover, this assessment matches Baker's behavior before and after Dingledine released her from suicide watch. Baker was friendly and humorous (*see, e.g.*, Doc. 21, #379–80 (noting Baker "joke[d] back and forth," "ma[de] [] goofy face[s]," and "playful[ly] banter[ed]" with Riahi)) and expressed hopefulness about her situation (*see, e.g.*, Doc. 27-1, #1750 (reporting Baker said that "she has 2 children that she lives for")). And although she fought with Herbert, both Dingledine and another prison social worker, who are experts on assessing suicidal tendencies in the prison setting, have explained that they do not consider inmate conflict to be a sign of suicide risk. (*See* Doc. 26, #1514–15; Doc. 27, #1688–89). Sure, Campbell cites two prison officials' deposition testimony in which they testified to their lay opinion that fighting *could* suggest a suicide risk. (Rumpler Dep., Doc. 28, #1812; Hurst Dep., Doc. 29, #1942). But here the prison experts who had just interviewed Baker (albeit before the fighting incident) did not detect suicidal tendencies. In light of that recent examination, the conflicting evidence between the guards and the licensed professionals as to what the fighting incident may have meant about Baker's suicidal ideations does not create a genuine issue of material fact for trial as to whether Baker

manifested a "strong likelihood" that she would commit suicide. *Barber v. City of Salem*, 953 F.2d 232, 238–40 (6th Cir. 1992). And certainly, that conflicting evidence regarding the implications of such conduct suggests, at the very least, that those implications were not "so obvious that even a lay person would easily recognize" them. *Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020) (citation omitted). In short, Campbell fails to identify any facts showing that a jury could conclude that the objective component is met.

Campbell principally counters in two ways. First, she says that, although Dingledine released Baker from suicide watch, Dingledine also put Baker on a treatment plan—evoking the language in *Griffith* that a medical need "diagnosed by a physician as mandating treatment" is a serious medical need. (Doc. 46, #2758).

But the central problem with that line of argument is that Dingledine did not diagnose a serious medical need requiring treatment. Indeed, she declined to provide Baker *any* diagnosis and rated her suicide risk as "low." That bill of health is counter to one that reflects a diagnosis of a serious medical need, or in particular a "strong likelihood," *Barber*, 953 F.2d at 238–40, that a prisoner will commit suicide. True, the form included a heading labeled "treatment plan" in which Dingledine wrote that "[c]lient is not cleared single celled." (Doc. 26-2, #1606). And she testified that Baker was "not cleared" for a single cell *because* "of the presence of the ongoing risk of self-harm or suicide" (though a "[l]ow" one by Dingledine's own words). (Doc. 26, #1548–49; Doc. 26-2, #1606). But context is important. The jail offers single-cell clearance to a very small portion of detainees—it is not the norm there. (Doc. 21, #299, 353; Doc.

24, #972, 1061; Doc. 28, #1824). A "treatment plan" in which a medical professional calls for a detainee to be treated like nearly every other healthy member of her community is hardly one that signals a "serious medical need." Indeed, Dingledine did not conclude that the risk merited any *treatment*.[8] She did not suggest that Baker receive further counseling or medication or anything of the sort. Rather, the residual risk merely meant that Baker should not receive a rare clearance—the ability to reside in a single cell—that was open to only a fraction of inmates. In short, the identified "low" residual suicide risk was not an objectively serious medical need.

Second, apart from any such diagnosis, Campbell points to *Troutman* and other cases to argue that, on the record here, Baker *did* exhibit suicidal tendencies.[9] Not so. Take *Troutman* as an example—it's the one Campbell spends the most time discussing. In *Troutman*, the inmate "attempted suicide three to four times in the past," "was currently thinking about suicide," "had a plan or suicide instrument in [his] possession," "showed signs of depression," "expressed feelings of hopelessness," "appeared anxious, afraid, or angry," and "appeared embarrassed or ashamed." 979

---

[8] Moreover, it is improper to label Baker's lack of clearance to be single celled a "treatment plan." As Campbell acknowledges, the refusal to clear detainees who were recently on suicide watch for single celling was a "step-down" policy implemented by the non-expert correctional staff at Butler County. (Doc. 46, #2739; Doc. 26, #1548–49, 1568–70). Thus, not only was Baker treated akin to almost the entire prison population, but she was also subject to an internal prison policy that applied to all detainees in Baker's situation regardless of any medical assessment of risk of self-harm—a "low" risk, here. Nothing in how Baker was treated as an inmate following her removal from suicide watch would have alerted officials—let alone lay individuals—to the fact that she suffered from a serious medical or psychological need that manifested in the form of suicidal ideation.

[9] Campbell also tries to take a list of factors used in *Troutman*, created by the expert in that case, and apply them here. But *Troutman* does not suggest that those factors necessarily dictate whether someone exhibits suicidal tendencies that rise to the level of a "serious medical need" in *other* cases.

F.3d at 477–78. And the plaintiff there—the inmate's daughter—called to report her father's brain injury and, when calling him, was concerned by his crying. *Id.* at 478.

This case is very different. Baker did not have a history of suicide attempts. She did not have a plan or intent to commit suicide, according to Dingledine. She showed signs of hopefulness, was friendly, and showed little agitation besides her roommate troubles. And unlike in *Troutman*, at the relevant time, Baker's mother expressed similar views to those of the experts—that Baker was fine. (*See* Campbell Dep., Doc. 31, #2180 (Campbell phoned and said "Suicide watch? She's not suicidal.")). Again, if close family or medical experts couldn't see any suicidal tendencies, how could they be "so obvious" that a lay person would "easily recognize" them? *Griffith*, 975 F.3d at 567 (citation omitted). They couldn't. So, as a legal matter,[10] Baker did not have a sufficiently serious medical need at the time of her death, and thus Campbell cannot satisfy the objective component of her claim.

### 2. Subjective Component.

Next, consider the subjective component. Recall that to establish this component, Campbell must be able to show that "each defendant acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm

---

[10] Usually this phrase is redundant. The Court uses it here because it is clear that, *as a matter of fact* (and with the benefit of hindsight), Baker had a problem that in common parlance we might call a serious medical need. She killed herself. Nobody healthy does that. But *as a matter of law*, Baker did not manifest a sufficiently serious medical need at the time of her death to warrant imposing liability on someone.

that is either known or so obvious [to the defendant] that it should be known."[11] *Helphenstine*, 60 F.4th at 317 (6th Cir. 2023) (cleaned up) (quoting *Brawner*, 14 F.4th at 596). She cannot show that for either defendant.

### a. Riahi.

To establish this component against Riahi, Campbell must show that Riahi both

   (1) knew or should have known that Baker was at risk for suicide and
   (2) deliberately and recklessly disregarded this risk by placing Baker in a single cell.

*See Troutman*, 979 F.3d at 485; *see also Perez v. Oakland Cnty.*, 466 F.3d 416, 425 (6th Cir. 2006). Because *Helphenstine* turns this into a recklessness analysis, it's convenient to ask what we would expect of a reasonable officer in Riahi's shoes.

Consider the facts reasonably available to Riahi. Yes, Riahi knew or should have known that Baker had come off suicide watch. (Doc. 21, #390, 392). But the "off" part of that is important. It means that a trained professional had decided that Baker did not present a sufficient suicide risk to warrant that labeling. Beyond that, officers, like Riahi, at the time had no access to records of Baker's behavior. (Doc. 26, #1537; Doc. 27, #1682). Meanwhile, as described above, Baker acted normally in Riahi's presence. (Doc. 21, #379–80 (Baker "joke[d] back and forth," "ma[de] [] goofy face[s],"

---

[11] Note that obviousness plays a role in both the objective and subjective components. But there is a difference. In the objective component, the question is whether the serious medical need would have been obvious *to anyone*. In other words, to meet the objective component, the plaintiff can point to facts known to others, not merely those known to a particular defendant. As for the subjective component by contrast, the obviousness inquiry is whether *a particular defendant* knew or should have known of the unjustifiably high risk of harm.

and "playful[ly] banter[ed]" with Riahi.)). No reasonable officer faced with those facts would detect hopelessness or other depressive personality traits in Baker.

True, an officer would have known, as Riahi did, that Baker was not cleared to be single-celled, and likely should have known that it was because of the potential for self-harm. But the same could be said of nearly everyone at the jail. (Doc. 21, #299, 353; Doc. 24, #972, 1061; Doc. 28, #1824). The potential for self-harm inherent in single-celling meant that *no* inmate could be single-celled without specific clearance from Forensics. The lack of such clearance would not have been much of a flag, if any, to an officer in Riahi's place.

Apart from that, Baker and Herbert were clearly fighting. While inmate conflict, as established above, does not necessarily reveal a suicide risk—or at least, would not reveal a risk that was obvious to a lay person (*see* Doc. 26, #1514–15; Doc. 27, #1688–89)—it does, of course, present a palpable risk to the inmates' physical safety. That is also something we expect jail guards to protect. In essence, an officer in Riahi's shoes would have been forced to balance two competing issues—a general policy against single celling that she had no reason to believe was *that* important for Baker anymore (as she had been cleared from suicide watch), on the one hand, and a specific concern about potential harm to Baker (and Herbert) based on an ongoing fight occurring in the open, on the other. Faced with these competing concerns, Riahi balanced them by briefly single celling both Baker and Herbert while she sought help. (Doc. 21, #429-30; Doc. 23-2, #783). That is not reckless.

Campbell responds that it was improper for Riahi to do so because Herbert "was the aggressor" and "it is appropriate to close the cell door of the aggressor, not of the victim." (Doc. 46, #2751). There are two problems with this argument. First, unrefuted evidence in the record shows that Baker, in the midst of her altercation with Herbert, shoved another inmate against a second-floor railing creating a risk that the other inmate "could have fallen off a top tier." (Doc. 21, #418, 431–32, 447). While Campbell disputes this account, she identifies no contrary record evidence and instead contends that the Court should discount Riahi's self-serving deposition testimony. (Doc. 46, #2767). But the absence of contradictory evidence cannot constitute specific evidence creating a genuine issue of material fact for trial. *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009). Thus, the record shows that Baker also posed a risk to the safety of other inmates, not just Herbert— justifying Riahi's decision to single cell both inmates. Second, even assuming that Baker did not specifically pose a risk to other inmates, the Court cannot say it was unreasonable, let alone reckless, for Riahi to have concluded that single celling both inmates was necessary to prevent retaliation by either inmate against the other, regardless who started the altercation. (Doc. 21, #432).

Moreover, it is also important to recall the duration of the single celling here. Riahi did not elect to permanently house Baker in a single cell. Nor did Riahi even leave her alone there for any extended period of time. Indeed, Baker had been alone in a cell far longer (granted, with the door open) earlier in the day, when Herbert, her cellmate, was at court. And recall, Herbert—the inmate with whom Baker was

fighting—was the only other female inmate in isolation, so the options for re-celling were limited. Given these exigent circumstances, Riahi elected to place Baker in a cell alone for a few minutes to protect her, her fellow combatant, and other inmates while Riahi worked on a more permanent fix. And within fifteen minutes after Riahi shut the cell doors to prevent the fighting, indeed, while Riahi was still on the phone with her supervisor, Baker hanged herself. (Doc. 21, #441–42; Doc. 23-2, #762, 784). Another guard may have made different choices (and, with the benefit of deliberation and hindsight, perhaps others would claim the same). But the Court cannot say that Riahi acted unreasonably or recklessly on the facts available to her in the situation in which she found herself. Thus, Campbell also cannot satisfy the subjective component of her claim.

### b. The Sheriff.

A plaintiff can sue a supervisory official under § 1983 when that official "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of [an] offending subordinate." *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (cleaned up). But that leads to a corollary. "[I]f a plaintiff cannot establish that a subordinate engaged in unconstitutional conduct, any attempt to impose supervisory liability must fail." *Young v. Campbell Cnty., Kentucky*, 846 F. App'x 314, 324 (6th Cir. 2021).

As explained above, Campbell cannot establish that Riahi acted with deliberate indifference. So she cannot pursue a supervisory liability theory against

the Sheriff. And because Campbell cannot establish liability against Riahi or the Sheriff under § 1983, the Court need not consider their qualified immunity defenses.

## B.    *Monell* Claims.

"Municipalities may be held liable under § 1983 for constitutional violations committed by their employees if the violations result from municipal practices or policies." *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). But "where there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability." *Id.* (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)).

Campbell brings *Monell* claims against Butler County and its Board of Commissioners. But because there has been no showing of individual constitutional violations by Riahi or the Sheriff, there can be no municipal liability either.

## C.    State Law Claims.

Campbell brings claims under Ohio law against Riahi and the Sheriff. But under Ohio Rev. Code § 2744.03(A)(6), as relevant here, "state employees are immune from suit unless they act … in a wanton or reckless manner." *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 602 (6th Cir. 2020) (cleaned up). One way "an employee acts in a reckless manner" is if he has "indifference to a known or obvious risk of harm to another that is unreasonable … and is substantially greater" than negligence. *Id*. That sounds a lot like deliberate indifference. So it makes sense, then, that when the employee is found to have not acted with deliberate indifference under

19

federal law, he is entitled to immunity under § 2744.03(A)(6)(b). *See id.* at 602–03 (citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir. 2002)).

Here, the Court found that Riahi and the Sheriff did not act with deliberate indifference. They are therefore immune from Campbell's state-law claims.

## CONCLUSION

Because Campbell cannot show that the jailers were responsible for her daughter's death, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 35) and **DISMISSES** her Complaint (Doc. 1) **WITH PREJUDICE**. In addition, the Court **DENIES AS MOOT** Campbell's Motion to Strike (Doc. 49). The Court **DIRECTS** the Clerk to enter judgment and **TERMINATE** this matter on the Court's docket.

**SO ORDERED.**

September 13, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**